**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen, Esq.
Jing Chen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com
Email: jchen@rosenlegal.com

Counsel for Lead Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ETIENNE BALON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiff,<br><br>v.<br><br>AGRIA CORPORATION, GUANGLIN LAI, XIE TAO, JOHN FULTON, and WAH KWONG TSANG,<br><br>Defendants. | Case No.: 2:16-cv-08376-SDW-LDW<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiffs Etienne Balon and Xiao Ming Zhou ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents,

announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Agria Corporation ("Agria" or the "Company"), advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action alleging that Defendants engaged in a scheme to manipulate the price of Agria's stock on the New York Stock Exchange ("NYSE") in order to inflate the trading price high enough to avoid having the NYSE delist the shares from trading on the exchange.

2. This action is brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased Agria American Depositary Shares ("ADSs" or "Shares") between June 8, 2016 and November 4, 2016, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b), 20(a), 9(a), and 9(f) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its officers and/or directors. Excluded from the Class are all defendants, the present and former officers and directors of Agria and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest. Also excluded from the Class are persons who have a net profit in purchases and sales of Agria ADSs or otherwise suffered no compensable damages under the securities laws during the Class Period.

3. Agria is a global agricultural company and derives its revenues primarily from operations in New Zealand, Australia, and South America. The Company's ADSs were traded on the NYSE under the ticker "GRO."

4. During the entire Class Period, Agria had been struggling to meet the NYSE's listing standards, particularly meeting the minimum share price and minimum market capitalization levels required to maintain its NYSE listing.

5. Pursuant to the NYSE Listed Company Manual 802.01C:

> A company will be considered to be below compliance standards if the average closing price of a security as reported on the consolidated tape is less than $1.00 over a consecutive 30 trading-day period. Once notified, the company must bring its share price and average share price back above $1.00 by six months following receipt of the notification.
>
> * * *
>
> In the event that at the expiration of the six-month cure period, both a $1.00 closing share price on the last trading day of the cure period and a $1.00 average closing share price over the 30 trading-day period ending on the last trading day of the cure period are not attained, the Exchange will commence suspension and delisting procedures.

6. The NYSE Listed Company Manual 802.01B provides that "a company will be considered to be below compliance if its average global market capitalization over a consecutive 30 trading-day period is less than $50,000,000 and, at the same time stockholders' equity is less than $50,000,000."

7. As admitted in its annual report on Form 20-F filed with the SEC for the fiscal year ended June 30, 2016 (the "2016 20-F"), Defendants were well aware that keeping Agria's NYSE listing status is critical to its business, operations, and reputation. The 2016 20-F stated in relevant part:

> If [Agria] ADSs are delisted as a result of [its] failure to comply with any of the New York Stock Exchange's minimum listing requirements, the liquidity of [its] ADSs would be adversely affected, the market price of [its] ADSs could further

> decrease, and our ability to obtain adequate financing for the continuation of [its] operations would be substantially impaired, which could have a material adverse effect on [its] financial condition and results of operations.

8. On April 28, 2016, Agria's average closing share price over a consecutive 30 trading-day period fell below $1.00 to $0.998667 and continued trading under $1.00 throughout the entire Class Period.

9. Knowing that Agria would soon receive a NYSE non-compliance warning and that it faced the certainty of delisting, Defendants secretly engaged in a scheme to manipulate Agria's stock price by making large numbers of daily stock purchases that had a staggering effect on Agria's daily trading volume and consequently drove up its share price. Defendants' stock manipulation artificially inflated Agria's stock price throughout the Class Period in an effort to avoid delisting from the NYSE.

10. On June 8, 2016 Defendants announced a $10 million ADS Repurchase Plan. Defendants' misleadingly stated that the repurchase program was instituted because Agria's shares were undervalued at the current price.

11. In announcing the repurchase plan, Defendants concealed from investors that the true purpose and effect of the repurchase plan was to inflate the price of Agria stock to avoid delisting of its stock.

12. On June 13, 2016, Agria announced that the NYSE had notified Agria that it was not in compliance with listing standards because its share price was too low. Agria never disclosed when it had actually received the delisting notice.

13. Defendants continued purchasing huge volumes of Agria stock that had the purpose and effect of artificially inflating the price of Agria stock.

14. On July 13, 2016, the NYSE sent Agria a letter informing the Company that the NYSE was conducting an investigation of unusual and suspicious trading in Agria stock and requested information and documents concerning Agria's purchases of its stock on the NYSE. This investigation was centered on determining whether Agria was illegally manipulating the price of its stock.

15. Defendants concealed the NYSE investigation from investors and continued to engage in manipulative purchasing of Agria stock in order to raise its share price to avoid a delisting by NYSE.

16. Defendants' manipulative scheme to artificially inflate Agria's stock price had an overwhelming effect on the market. Defendants bought back a staggering portion of Agria's daily ADS volume on the NYSE, constituting 1/8 to 1/3 of the entire market daily volume - without disclosing this to the public.

17. On November 3, 2016, the NYSE suspended trading of Agria ADSs and commenced the process to delist Agria ADSs.

18. Agria disclosed this adverse development the next day, November 4, 2016, stating that the NYSE, after an investigation, identified evidence that Agria and its senior executives engaged in illegal trading intended to artificially inflate its ADS price for the purpose of gaining compliance with the NYSE's minimum listing requirements (to avoid delisting), and that Agria had provided incomplete, misleading, and false information to the NSYE in connection with the NYSE's investigation into the illegal stock manipulation scheme.

19. The November 4, 2016, press release also revealed that Agria had previously withheld material information from the general public, specifically that on July 13, 2016 the Company had received an NYSE notice of investigation in connection with Defendants'

manipulation of Agria's share price by buying large amounts of stock each day in an effort to pump up the price and avoid delisting by the NYSE.

20. The great extent to which Agria artificially pumped up its ADS price can be understood from its October 27, 2016 letter to shareholders ("October Letter to Shareholders"). In the October Letter to Shareholders, Agria admitted that its daily share repurchases had constituted between 1/8 and 1/3 of the daily volume of its ADS during the Class Period, depending on the day. In addition, Agria also had the discretion to make larger block purchases once a week. Of course, Agria never disclosed in this letter that the repurchases were for a devious scheme of artificially pumping up its ADS price to comply with NYSE listing standards. Instead, Agria stated that it was repurchasing its own ADSs because it valued its "net asset value" higher than the price at which the ADSs were trading, i.e., they falsely claimed they were purchasing Agria shares because the share price was undervalued.[1]

21. At the time that its ADSs were halted by the NYSE on November 3, 2016, Agria's ADSs were trading at $0.85 per ADS. On January 2, 2017, Agria's ADSs became formally delisted from the NYSE. The trading halt and ultimate delisting of Agria's shares has rendered them worthless, causing all Class Members a total loss in their investment.

## JURISDICTION AND VENUE

22. The claims asserted herein arise under and pursuant to Sections 10(b), 20(a), 9(a), and 9(f) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

23. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

[1] http://ir.agriacorp.com/phoenix.zhtml?c=216437&p=irol-newsArticle&ID=2209994

24. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) because significant portion of Defendants' conduct and subsequent damages occurred in this District.

25. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

26. Plaintiffs purchased Agria ADSs at artificially inflated prices during the Class period and have been damaged thereby. Their PSLRA certifications were previously filed with this Court and are incorporated by reference.

27. Defendant Agria is a global agricultural company incorporated in the Cayman Islands and headquartered in Hong Kong. Agria has operations and networks servicing New Zealand, Australia, South America, China, and various other international markets, including the United States. Its business consists primarily of three principal business segments: Seed and Grain; Crop Protection, Nutrients and Merchandise; and Rural Services. The Seed and Grain segment purports to engage in research and development, production and sale of a broad range of seed products and trading of seed and grain products globally. The Crop Protection, Nutrients and Merchandise segment purports to operate an extensive chain of retail stores that supply farm input materials. The Rural Services segment purports to provide livestock trading, wool trading, irrigation and pumping, real estate agency and other agricultural services.

28. Defendant Guanglin Lai ("Lai") has served as the Chairman of the Board of Directors of Agria since June 2007 and has been the Company's Executive Chairman since

March 2013. Defendant Guanglin Lai (the executive chairman) owns 48.25% of the ordinary shares of the company, which includes (i) 48,522,000 ordinary shares owned by Brothers Capital Limited, or BCL, a British Virgin Islands company wholly owned by Mr. Lai, (ii) 800,000 ordinary shares issuable upon the exercise of options exercisable within 60 days after August 31, 2016, and (iii) 4,125,312 ordinary shares in the form of ADSs.

29. Defendant Xie Tao ("Tao") has served as the Chief Executive Officer ("CEO") of Agria since September 2009, and became a Director and member of Agria's Corporate Governance and Nominating Committee in March 2010. During the Class Period, Tao controlled 48.25% of all of Agria's ordinary shares.

30. Defendant John Fulton ("Fulton") has served as Agria's Chief Financial Officer ("CFO") since January 2015.

31. Defendant Wah Kwong Tsang ("Tsang") has served as an Independent Director of Agria and the Chairman of the Company's Audit Committee since August 2011, the Chairman of the Compensation Committee since November 2013, and member of Nomination Committee since October 2012.

32. Defendants Lai, Tao, Fulton, Tsang are sometimes herein collectively referred to as the "Individual Defendants."

33. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

34. Agria is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

35. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

36. Defendants Agria and Individual Defendants are herein referred to as "Defendants."

## <u>ALLEGATIONS OF FRAUD</u>

37. Agria went public and began trading on the NYSE on November 7, 2007.

38. Starting from the middle of 2010, when Agria's stock price began to consistently fall below $2.00/ADS, it faced the risk of non-compliance with the NYSE listing requirements, which, among other things, called for a $1.00 minimum closing price over a 30-day consecutive trading day period and minimum market capitalization of $50 million.

39. On July 19, 2012, Agria received a non-compliance warning from the NYSE, stating that Agria was not in compliance with the NYSE's minimum price listing requirements. Agria was afforded six months to cure the issue. Afterwards, for nearly four years Agria was able to manage to maintain its stock price around $1.50/ADS to keep its listing status on NYSE.

40. However, going into 2016, Agria's ADS price again started to fall consistently below $1.00/ADS and showed no signs of climbing back to the requisite minimum $1.00/share average daily closing price and maintaining a stable position about the required minimum price. For example, from March 17, 2016 to April 28, 2016, Agria's average closing price over the consecutive 30 trading-day period fell below $1.00/share.

41. In anticipation of receiving the impending NYSE non-compliance warning and facing the real risk of being delisted, Defendants decided to take unscrupulous, preemptive measures and issued a press release on June 8, 2016 announcing that Agria's Board of Directors authorized a share repurchase program, under which Agria would repurchase up to $10 million of its ADS through December 31, 2017.[2]

42. Given that Agria was out of compliance with NYSE listing standards as of April 28, 2016, it would have received a notice of non-compliance prior to Agria's June 8, 2016 announcement of the stock repurchase program.

43. In the same press release, Defendant Lai concealed Defendants' scheme, making it appear that the stock repurchase was purely an investment decision based on Defendants' belief that Agria's share price was undervalued, that Agria's shares were worth more than the current market price, and that Agria's current share price did not accurately reflect their true value, stating in relevant part:

---

[2] http://ir.agriacorp.com/phoenix.zhtml?c=216437&p=irol-newsArticle&ID=2176021

> We are pleased with our strategic investment in PGG Wrightson Limited ("PGW"), as we have successfully turned around PGW since 2009. PGW has over the last few years consistently delivered good results and performed well across all lines of its business. We are confident of the growth and strategic opportunities PGW will bring to the Company and our shareholders. Our Board of Directors and senior management strongly believe that the current valuation of Agria shares does not reflect the intrinsic value of the Company and the growth and strategic opportunities of PGW.

44. This statement was false and misleading because, whether or not Agria's share price was undervalued, the true purpose for the stock repurchase was to manipulate an increase in Agria's stock price to meet the NYSE's minimum listing requirements and to avoid delisting.

45. On June 13, 2016, a mere five days after Agria announced its stock repurchase plan, the Company revealed that it received a notice from the NYSE warning that Agria was not in compliance with the NYSE minimum average closing price continued listing standard requiring a listed security to maintain a minimum average closing price of $1.00 per share over a consecutive 30-trading-day period. The NYSE notified Agria that the Company had six months from receipt of the notification to bring its ADS price and average ADS price back above $1.00.

46. Curiously, in the June 13, 2016 announcement, Agria never disclosed exactly when it received the NYSE non-compliance warning. The NYSE Listed Company Manual 802.01C provides that a non-U.S. company must issue a press release within 30 days after receipt of the NYSE warning.

47. Given that Agria's ADSs fell below the $1.00 minimum 30-day average closing price requirement on April 28, 2016, Defendants deceptively delayed announcing the June 13 NYSE warning in order to first begin their manipulative stock inflation scheme and minimize the negative effect the June 13 notice of NYSE non-compliance would have on its stock price.

48. On September 20, 2016, Agria publicly filed its SEC form 2016 20-F, which provided its year-end financial results and position and stated that its internal control over

financial reporting and disclosure controls and procedures were effective as of June 30, 2016. The 2016 20-F was signed by Defendant Lai. The 2016-20F also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Lai and Fulton attesting to the accuracy of financial reporting, the disclosure of any material changes to Agria's internal controls over financial reporting, and the disclosure of all fraud. The 2016 20-F states, in relevant part:

> Our board of directors authorized a share repurchase program on June 8, 2016, under which we may repurchase up to $10 million of its outstanding ADS through December 31, 2017. The repurchases may be made on the open market at prevailing market prices, in privately negotiated transactions, in block trades or through other legally permissible means as determined by our management, including through Rule 10b5-1 share repurchase plans. The timing and extent of any purchases will depend on market conditions and be in accordance with applicable rules and regulations. Our board of directors will review the share repurchase program periodically, and may authorize adjustment of its terms and size. We plan to fund repurchases made under this program from its available cash balance.

49. The 2016 20-F is misleading because Defendants failed to disclose the material fact that the true purpose of the stock repurchase program was to manipulate Agria's share price by purchasing a large amount of Agria's shares and thus drive up its stock price in order to avoid a delisting from the NYSE. Agria management had secretly launched a manipulative trading scheme for the purpose of pumping up Agria stock price in order to meet the NYSE's minimum price listing requirement.

50. The 2016 20-F is misleading also because it failed to disclose that Agria's illegal stock manipulation activities had caught the NYSE's attention and that on July 13, 2016, Agria received a request for information from the NYSE concerning the Company's compliance with the NYSE's minimum price requirements and its unusual and manipulative trading activity.

51. The magnitude of Defendants' stock repurchases (i.e. buying 1/8 to 1/3 of the total daily volume of Agria's shares in the name of exploiting a price anomaly) while Defendants were in possession of the material non-public information that NYSE had notified Agria of the impending delisting of its stock, constituted illegal insider trading and because the true purpose of such trading was to drive up Agria's share price to avoid a delisting, Defendants were obligated to disclose publicly the true purpose of their insider trading or refrain from such trading.

**DEFENDANTS' ILLEGAL SCHEME IS DISCLOSED CAUSING DAMAGES**

52. On November 4, 2016, Agria issued a press release announcing that it received a letter from the NYSE on November 3, 2016, informing Agria that the NYSE decided to commence proceedings to delist Agria ADSs. The press release states in relevant part:

> According to the NYSE the determination to delist the Company was based on an investigation conducted by NYSE Regulation, which uncovered evidence demonstrating that the Company and its management engaged in operations contrary to the public interest and not in keeping with sound public policy pursuant to Section 802.01D of the Listed Company Manual. NYSE stated that it identified evidence indicating that the Company (i) through a top executive and other intermediaries engaged in trading intended to artificially inflate Agria's stock price, including to improperly avoid having the Company delisted for failing to comply with NYSE's continued listing standards requiring companies to maintain an average stock price of at least $1.000 per share over a consecutive thirty-day trading period; and (ii) provided incomplete, misleading, or false information in connection with investigations related to these issues.

53. The November 4, 2016 announcement also disclosed that the NYSE had found evidence that Agria and its senior executives had engaged in an illegal scheme to manipulate the price of Agria stock to avoid a delisting by NYSE. The announcement read in part:

> According to NYSE, the determination to delist the Company was based on an investigation conducted by NYSE Regulation, which uncovered evidence demonstrating that the Company and its management engaged in operations contrary to the public interest and not in keeping with sound public policy pursuant to Section 802.01D of the Listed Company Manual. NYSE stated that it identified evidence indicating that the

> Company (i) through a top executive and other intermediaries engaged in trading intended to artificially inflate Agria's stock price, including to improperly avoid having the Company delisted for failing to comply with NYSE's continued listing standards requiring companies to maintain an average stock price of at least $1.000 per share over a consecutive thirty-day trading period; and (ii) provided incomplete, misleading, or false information in connection with investigations related to these issues.
>
> The Company is in the process of obtaining additional information about the circumstances of the NYSE allegations and considering additional options, including filing an appeal to the Committee of the Board of Directors of the NYSE challenging the commencement of delisting proceedings.
>
> In addition, on December 23, 2015, the Company received a subpoena from the United States Securities and Exchange Commission ("SEC") in connection with a non-public investigation. The SEC's subpoena is focused on, among other things, Agria's historic and ongoing business operations in China.

54. This announcement revealed the truth about Agria's stock repurchase program: it was a ploy by Defendants to artificially pump up the price of its ADSs, so that Agria could avoid getting delisted by the NYSE for failing to meet the NYSE's minimum listing price requirements.

55. Trading of the Agria's ADSs was thus suspended on November 3, 2016 when its share price was at $0.85 per ADS. On January 2, 2017, Agria's stock was formally delisted, rendering its Shares worthless now.

56. Agria's October Letter to Shareholders offers a glimpse into the staggering volume of Agria's stock manipulation scheme:

> We are writing to report on the initial success of your Company's share repurchase program. As you may recall, on June 8, 2016 the Board authorized the repurchase of up to $10 million worth of our American Depositary Shares ("ADS" or "shares"), which trade on the New York Stock Exchange. The repurchase program was motivated by the Board's assessment that the ADSs were significantly undervalued relative to the assets of the firm. In particular, the trading price of an ADS is still today far below the our calculation of net asset value of the company, which reflects our economic interest in PGG Wrightson less debt and other liabilities.

> Based on the most recently quoted price of PGG Wrightson and the current NZD/USD exchange rate, we calculate our net asset value at over $1.35 per ADS, significantly above the most recently quoted trading price of $0.85 per ADS.
>
> **We are taking action to address this valuation discount.**
>
> On October 6, 2016, we announced that we had adopted a 10b5-1 trading program, which enables us to buy shares in the open market on a regular and predefined basis, thus avoiding any issues relating to material non-public information. At the time of the announcement, the Board had approved the program, the trading account was opened with a major US-based brokerage firm, and purchases had commenced. **We have been active buyers in the open market on every day since announcing the program. <u>Our volume has varied between 1/8 up to 1/3 of daily volume, depending on the day.</u> We are also authorized to make larger block purchases once a week, at our discretion.**
>
> Agria has a number of attractive options for deploying capital, due to the many growth opportunities at our main subsidiary PGG Wrightson. Most of our earnings will be redeployed to drive growth at PGW. Nonetheless, as long as our ADS remain significantly undervalued relative to our net asset value, we consider share repurchases to be a good use of capital, and the repurchase program will continue until the authorization limit is reached. At that point, should the ADS remain undervalued, we anticipate that the Board would extend the authorization amount and term.
>
> (Emphasis added).

57. Defendants' orchestrating these stock repurchases, 1/8 to 1/3 of the total daily volume of Agria's shares traded on the NYSE, while failing to disclose their true purpose of the purchases was to inflate the value of Agria stock to avoid an NYSE delisting, was a violation of the federal securities laws because in addition to misleading investors, Defendants were also obligated to disclose publicly the true purpose of their insider trading or refrain from such trading.

58. When the truth concerning Defendants' stock manipulation scheme was discovered, on November 3, 2016, the NYSE halted trading in Agria shares and on January 2, 2017, NYSE delisted the shares from further trading, rendering the shares worthless and causing a complete loss to investors.

**ADDITIONAL ALLEGATIONS OF SCIENTER**

59. To provide cover for their secret scheme to artificially inflate Agria's ADS price, Defendants also released misleading information regarding the business conditions and prospects of PGW, Agria's primary subsidiary.

60. Pursuant to the 2016 20-F, Agria holds a 50.22% equity interest in PGW, a public company listed on the New Zealand Stock Exchange. Agria derives a over 98% of its revenue from PGW, and Agria's revenues are directly tied to the business and operations of PGW.

61. On June 15, 2016, Agria announced that PGW raised its guidance for fiscal year 2016 Operating EBITDA from the original guidance range of NZ$61 to NZ$67 million to a new range of NZ$65 to NZ$68 million.

62. On July 7, 2016, Agria received another non-compliance warning from the NYSE. The July 7, 2016 non-compliance warning stated that Agria was not in compliance with the NYSE minimum average market capitalization and stockholders' equity continued listing standard, which requires that a listed company's average market capitalization be not less than $50 million over a consecutive 30 trading-day period and its stockholders' equity be not less than $50 million. Agria was given 90 days from the receipt of the notice to submit a business plan that demonstrates how it intends to regain compliance with this continued listed standard within 18 months of the receipt of the notice. Despite receiving the July 7, 2016 non-compliance warning, Agria did not disclose it until August 8, 2016.

63. On August 3, 2016, Agria announced that PGW raised its guidance for fiscal year 2016 Operating EBITDA for the second time in two months, which would be above the upper end of the guidance range of NZ$65 to NZ$68 million (US$46 million to US$49 million)

announced in June 2016. Also on August 3, 2016, Agria announced PGW expects net profit for fiscal year 2016 to be up at least 20% compared to fiscal year 2015.

64. Contrary to what Agria touted in the June 8, 2016 press release announcing its intention to buy back its own stock specifically that "we have successfully turned around PGW since 2009. PGW has over the last few years consistently delivered good results and performed well across all lines of its business. We are confident of the growth and strategic opportunities PGW will bring to the Company and our shareholders," PGW's true financial condition presents a much bleaker picture. Indeed, PGW's stock price has been consistently trading around NZ 0.50 (approximately USD $ 0.36) a share since 2010. Further, PGW's revenues have been declining year over year since 2014 pursuant to the 2016 20-F.

| | **PGW** | | |
|---|---|---|---|
| | **For the year ended June, 30** | | |
| | **2016** | **2015** | **2014** |
| | **(US$'000)** | **(US$'000)** | **(US$'000)** |
| **Summarized statement of profit or loss** | | | |
| Revenue | 792,322 | 931,488 | 1,013,690 |
| Profit for the year | 26,593 | 25,301 | 35,322 |
| Other comprehensive income | (3,758) | 5,533 | 23,510 |
| **Total comprehensive income** | 22,835 | 30,834 | 58,832 |
| Dividends paid to non-controlling interests | 9,837 | 16,556 | 10,407 |
| | | | |
| **Summarized cash flows** | | | |
| Cash flows provided by operating activities | 23,606 | 22,583 | 45,585 |
| Cash flows used | (8,817) | (10,550) | (15,359) |

| | | | |
|---|---|---|---|
| in investing activities | | | |
| Cash flows used in financing activities | (14,596) | (15,183) | (25,614) |
| Net increase / (decrease) in cash and cash equivalents | 193 | (3,150) | 4,612 |

PGW Stock Chart From December 2000 To February 22, 2017




65. Furthermore, PGW was mired in legal problems. In 2015 the New Zealand Commerce Commission ("NZ Commission") found that PGW violated the New Zealand Commerce Act as to fees associated with the implementation of National Animal Identification and Tracing Act 2012 requirements. PGW was forced to reach a settlement with the NZ Commission in December 2015 to resolve this charge.

66. The poor financial condition of PGW and its consistently low trading price (i.e. less than $0.36 USD per share since 2010) further belie Agria's assertion that it was repurchasing its ADS because its ADS did not accurately reflect Agria's ownership interest in PGW and was thus undervalued. Agria's assertion was nothing more than a cover for the true reason for Agria's

massive stock buyback: to artificially inflate its ADS price and avoid delisting by the NYSE for failing to meet minimum price requirements.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:

### Fraud-on-the-Market Doctrine

67. At all relevant times, the market for Agria ADS was an efficient market for the following reasons, among others:

a. Agria's ADS was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, Agria filed periodic public reports with the SEC;

c. Agria regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d. Unexpected material news about Agria was rapidly reflected and incorporated into the Company's stock price during the Class Period.

68. As a result of the foregoing, the market for Agria ADS promptly digested current information regarding Agria from all publicly available sources and reflected such information in the price of Agria ADS. Under these circumstances, all purchasers of Agria ADS during the Class Period suffered similar injury through their purchase of Agria ADS at artificially inflated prices, and a presumption of reliance applies.

## ***AFFILIATED UTE***

69. Neither Plaintiffs nor the Class need prove reliance – either individually or as a class because under the circumstances of this case, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

70. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Agria ADSs traded on NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

71. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Agria ADSs were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Agria or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

72. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

73. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

74. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and management of Agria;
- whether the Individual Defendants caused Agria to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Agria ADSs during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

75. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
## Violation of Section 10(b) Of The Exchange Act Against and Rule 10b-5 Promulgated Thereunder Against All Defendants

76. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

77. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase Agria's ADSs at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

78. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's ADSs in an effort to maintain artificially high market prices for Agria's ADSs in violation of Section 10(b) of the

Exchange Act and Rule 10b-5 thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

79. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Agria as specified herein.

80. Defendants made misrepresentations and omissions of material fact in furtherance of a stock manipulation scheme that had the purpose and effect of artificially inflating Agria's share price to avoid a delisting of its ADSs by the NYSE.

81. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Agria value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Agria and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Agria ADSs during the Class Period.

82. Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents of the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his or her responsibilities

and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

83. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly.

84. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Agria's ADSs was artificially inflated during the Class Period. In ignorance of the fact that market prices of Agria's publicly-traded ADSs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the ADSs trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclose in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Agria ADSs during the Class Period at artificially inflated prices and were or will be damaged thereby.

85. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs

and the other members of the Class and the marketplace known the truth regarding Agria's financial results, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired Agria ADSs, or, if they had acquired such ADS during the Class Period, they would not have done so at the artificially inflated prices that they paid.

86. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

87. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's ADSs during the Class Period.

88. This action was filed within two years of discovery of the fraud and within five years of each plaintiffs' purchases of ADSs giving rise to the cause of action.

## COUNT II
## Violation of Section 20(a) Of The Exchange Act Against the Individual Defendants

89. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

90. Individual Defendants are sued herein as a controlling person of Agria.

91. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness and/or intimate knowledge of the misleading statements disseminated to the investing public, these defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the primary violator, including the content and dissemination of the various statements that plaintiff contends are false and misleading. In particular, each defendant had the power to control or influence the

particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

92. As set forth above, Agria violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint.

93. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's ADSs during the Class Period.

94. This action was filed within two years of discovery of the fraud and within five years of each Plaintiffs' purchases of ADSs giving rise to the cause of action.

**COUNT III**
**Violation of Section 9(a) and 9(f) Of**
**The Exchange Act Against the All Defendants**

95. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

96. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (2) engaged in a scheme to inflate the price of Agria ADSs; and (3) mislead and caused Plaintiffs and other members of the Class to purchase Agria's ADS at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

97. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's ADSs in an effort to maintain artificially high market prices for Agria's ADSs in violation of Sections 9(a) and 9(f) of the Exchange Act. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

98. By virtue of the foregoing, Defendants made statements which were at the time and in the light of the circumstances under which they were made, false or misleading with respect to the value of Agria ADSs and the reason for Agria's repurchase plan, which Defendants knew or had reasonable ground to believe were so false or misleading.

99. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to make said false or misleading statements with respect to the value of Agria ADSs and the reason for Agria's repurchase plan, which Defendants knew or had reasonable grounds to believe were so false or misleading.

100. Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents of the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all

relevant times; and (4) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

101. At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Agria's true value and Defendants' price manipulation, which was not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired Agria ADSs, or, if they had acquired such ADS during the Class Period, they would not have done so at the artificially inflated prices that they paid.

102. By virtue of the foregoing, Defendants violated Section 9(a) and 9(f) of the Exchange Act, 15 U.S.C. § 78i(a) and 78i(f).

103. As a direct and proximate result of Defendants' conduct as described herein, Plaintiffs have suffered significant damages and are entitled to such damages from Defendants, jointly and severally.

104. This action was filed within one year of discovery of the fraud and within three years of each Plaintiffs' purchases of ADSs giving rise to the cause of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

a. Determining that this action is a proper class action, designating Plaintiffs as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

b. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: March 8, 2017

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/Laurence Rosen
Laurence Rosen, Esq.
Jing Chen, Esq.
609 W. South Orange Avenue
Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com
Email: jchen@rosenlegal.com

Counsel for Lead Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of March 2017 a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/* Laurence Rosen